# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IMPACT NETWORKING, LLC,

     Plaintiff,

     v.

IMPACT TECHNOLOGY
SOLUTIONS, INC.,

     Defendant.

Case No. 17 C 5205

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Impact Networking, LLC has sued Defendant Impact Technology Solutions, Inc., alleging, among other things, that Defendant's logo infringes Plaintiff's trademarks. Along with its complaint, Plaintiff filed a motion for preliminary injunction, seeking to bar Defendant from using the allegedly infringing logo. This Court held an evidentiary hearing on October 4 and 19, 2017, and the parties then filed post-hearing briefs, along with proposed findings and conclusions. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(2).

I.    <u>Background and Procedural History</u>

Plaintiff Impact Networking, an Illinois company with offices in Illinois and Indiana, was formed in 1999 to sell and service office equipment; the business as initially formed "entailed printers and copiers and managed IT support, which is helping people with their IT infrastructure." Tr. of Proceedings of 10/4/17 [51], at

12–13.  The company also offered desktop PC support (including project management, office automation, desktop apps, and graphic imaging), as well as internet support (including connectivity, email, and website support).  *Id.* at 14.

In connection with its business, Plaintiff registered two service marks.  The first, Reg. No. 2,425,077, issued June 30, 2001, and appears as follows:

## IMPACT NETWORKING

*See* Plaintiff's Exhibit 2.  The registration indicates two uses: for Distributorship in the Field of Office Equipment and Supplies, in Class 35 (with a first use date of 8-0-1999), and for "Maintenance and Repair of Office Machinery, in Class 37" (with a first use date of 8-0-1999).[1]  *Id.*  The second mark, Reg. No. 2,428,340, issued February 13, 2001, covers the company's logo and looks like this:



*See* Plaintiff's Exhibit 3.  This registration similarly indicates two uses:  for "Maintenance and Repair of Office Machinery, in Class 37" (with a first use date of 9-0-1999), and for "Distributorships in the Field of Office Equipment and Supplies, in Class 39" (with a first use date of 9-0-1999).[2]  *Id.*

---

[1] Class 35 covers advertising and business services, and Class 37 covers construction and repair services.  *See* https://tmidm.uspto.gov/id-master-list-public.html.

[2] Class 39 covers transportation and storage.  *See id.*

Plaintiff's current logo (the unregistered mark) looks like this:



Defendant Impact Technology Solutions, an Indiana company located in Valparaiso, Indiana, was formed in December 2011. Tr. of Proceedings of 10/19/17 [53], at 157. Since its inception, Defendant has operated as a managed service provider for small businesses; it provides managed IT services, desktop support, service support, backup and disaster recovery, email, cloud services, and virtualization. *Id.* at 158–59. The company has one office, in Valparaiso, Indiana, and six employees (including the three founding partners). *Id.* at 160. The company has about 75 customers (the vast majority of which are in Northwest Indiana) and turns a small profit (about $5,000) each year. *Id.* Its logo looks like this:



On July 14, 2017, Plaintiff sued Defendant, alleging trademark infringement in violation of 15 U.S.C. § 1114; unfair competition in violation of 15 U.S.C. § 1125 and under common law; violation of the Illinois Uniform Deceptive Trade Practices Act; and violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. *See* [1]. Plaintiff filed a motion for preliminary injunction [17] on July 20, 2017. In response to the complaint, Defendant filed a counterclaim [49], seeking

cancellation of Plaintiff's marks and a declaratory judgment that Plaintiff has abandoned its rights in the "Impact Networking" mark.

This Court held an initial hearing in the case on July 27, 2017, and, by agreement, set the matter for an evidentiary hearing on the preliminary injunction motion on August 31, 2017. [25]. Thereafter, the parties requested limited expedited discovery, which the Court allowed, and the evidentiary hearing was reset for October 4, 2017. [32]. At the hearing, which was continued by agreement to October 19, 2017, both sides presented live witness testimony and documentary evidence, as well as arguments. [50, 52].

Plaintiff first presented Dan Meyer, Impact Networking's president and founding partner, who testified that he and Frank Cucco formed the company in the fall of 1999. [51] at 12. At that time, the company's business purpose was "office equipment, which entailed printers and copiers and managed IT support, which is helping people with their IT infrastructure." *Id.* at 13. From its inception, the company offered desktop PC support, including project management, office automation, desktop applications, graphic imaging and internet support. *Id.* at 14. Meyer testified that his company has been using and offering the same services continuously since its inception. *Id.* at 15. Meyer testified that the company has offered the services it offers today—namely, backup and disaster recovery service, cloud solutions, network monitoring, virtualization, spam protection, server support, and network security—continuously as they became available and by at

least 2011.  *Id.* at 24–26.  Meyer conceded, however, that none of these services are listed in the company's trademark registrations.  *Id.* at 48–49.

Meyer testified that Plaintiff operates primarily in Illinois, Indiana, Wisconsin, and California—though it began operating in California only a week prior to the hearing.  *Id.* at 28.  It has operated in northwest Indiana and the Chicagoland area since late 1999.  *Id.*  Plaintiff has two offices in Indiana: one in Indianapolis, opened in 2008, and one in Hammond, opened in January 2017.  *Id.*

Meyer testified that Plaintiff advertises through radio and TV, billboards and vehicles, and at sporting venues (including major league teams' venues, such as Chicago Blackhawks games at the United Center, Chicago Cubs games at Wrigley Field, and Milwaukee Brewer games at Miller Park, and minor league teams' venues, including the Chicago Wolves, the Indianapolis Indians, the Kenosha Kingfish and the Madison Mallards).  Plaintiff distributes and mails literature, cold calls prospective clients, hosts PowerPoint presentations and "lunch-and-learns," and markets through social media including LinkedIn, Facebook, Instagram, Twitter and Pinterest.  *Id.* at 29, 30–31, 33.  Plaintiff owns an office building in Lake Forest, Illinois, with signage visible from the expressway, and it recently reached a deal for signage and naming rights for the new home of the Chicago Dogs (an independent baseball team), which is being built now in Rosemont, Illinois.  *Id.* at 34.  Plaintiff targets signage on buildings near busy expressways to build brand and name recognition.  *Id.* at 36.  Meyer testified that Plaintiff puts its name on "just about everything from cell phone covers to shirts to you name it."  *Id.* at 29.

Plaintiff had total revenues of over $58 million in 2016. *Id.* at 59. In 2012, Plaintiff spent $580,000 on advertising; in 2016, it spent $1.76 million; and in the first half of 2017 it spent $1.2 million. *Id.* at 39. Meyer testified that Plaintiff employs approximately 180 people just in sales and marketing, *id.* at 29, each of whom has a "minimum target" of 500 telemarketing calls and 300 cold calls per month. *Id.* at 31–32. Meyer testified that Plaintiff's sales force targets "C-level employees" at target companies—that is, CEO, CFO, and other high-ranking officers—because it wants buy-in and authorization at that level. *Id.* at 57. Meyer testified that the process of securing a customer takes time and involves several meetings, an assessment, and the execution of a written agreement. *Id.* at 57. With this process, Plaintiff's employees "would make sure the customer knows who [they] are." *Id.* at 57–58. Meyer testified that the contracts Plaintiff ultimately executes with its customers are mostly long term (five years); although the company has some contracts that are project-based and run for less than a year, the vast majority are for more than one year and most are for five years. *Id.* at 58. Plaintiff believes its customers "use a high degree of care in selecting their provider of managed IT and cloud-based services." *Id* at 58–59.

The record shows that Defendant is a much smaller operation, with just six employees and total revenues of less than $500,000. Defendant's Chief Information officer and 47% owner, Chris Deehan, testified that his company, which has always been called Impact Technology Solutions, Inc., began doing business in December 2011. *Id.* at 80, 90. Deehan testified that the company offers managed IT services.

*Id.* at 82. He testified that, as of October 2017, Defendant had approximately 75 active customers, primarily located in Indiana, with a few in Illinois, one in Michigan, one in West Virginia, one in Pennsylvania, and one in Utah. *Id.* at 113–114, 115. Defendant had gross revenue of $250,000 in 2014 and $380,000 in 2015, and the company's profits for the last five years hover around $5,000 per year. *Id.* at 120. It is undisputed that Plaintiff and Defendant are, in fact, servicing existing customers in the same geographic area (Northwest Indiana), and that their targeted customer base overlaps in this area. [51] at 117.

The record shows that Defendant's solicitation process for potential customers is similar to Plaintiff's in that both companies engage in discussions and meetings prior to formalizing a contractual relationship. Deehan testified that, when courting a prospective customer, Defendant also targets owners or C-level representatives, such as CEOs, and typically meets with the customer three or four times before Defendant is hired. *Id.* at 118; [53] at 185. Deehan testified that the process of going from an initial meeting to Defendant being hired takes about three to six months, and that by the time the deal is signed, the customer is familiar with the Defendant company. [53] at 186. Deehan testified that Defendant's business model does not allow customers to purchase Defendant's services without first meeting someone from the company, and customers cannot purchase Defendant's services online. *Id.* at 186–87. Deehan also testified that the majority of Defendant's customers have signed multi-year contracts with Defendant and spend $600 to $6,000 per month for Defendant's services. *Id.* at 187. Deehan testified

that, because Defendant's services involve "a fairly long-term agreement and semi-significant amount of money every month," Defendant's customers "put a lot of consideration and thought into deciding whether to purchase" Defendant's services. *Id.* at 187−88.

Apparently, Plaintiff and Defendant operated in an overlapping geographic area for years before learning of each other's existence. On January 20, 2016, Joshua Loudenslager, who worked for Synnex, a vendor that serviced both Plaintiff and Defendant, sent an email to Hannah Dobryman at Plaintiff and Jeremy Carnahan at Defendant, referencing a potential business opportunity for Plaintiff. *See* Plaintiff's Exhibit 10. It is not clear that Plaintiff responded to this email, as the record only includes a response from Defendant. *Id.* But Loudenslager sent another email to both companies on April 7, 2016. *See* Plaintiff's Exhibit 9. This time, Plaintiff's employee responded to the vendor's email saying: "What PO is this for? I noticed 'Impact Technology Solutions' below – that isn't us." *Id.* The vendor responded "You know what . . . you are right. I'm sorry Haley . . . ." *Id.* According to Meyer, both Plaintiff and Defendant did business with vendor Synnex, and Synnex "accidentally sent that email" to Plaintiff. [51] at 42. Meyer testified that he did not know about this email, and that he personally first heard about Defendant in May of 2017. *Id.* at 40. Meyer testified that Plaintiff sent Defendant a cease-and-desist letter in May 2017. *Id.* at 40. To his knowledge, Defendant did not respond to the letter. *Id.* at 40.

Deehan testified that Defendant first became aware of Plaintiff on February 14, 2017. *Id.* at 122. On that date, Jeff Eichensehr, a former partner at Defendant, sent Deehan and his partner an email forwarding a brochure from Plaintiff; the email confirmed that Plaintiff was providing the same services as Defendant (managed IT services). *Id.* Deehan testified that Defendant received the cease-and-desist letter in late May or early June of 2017; he testified that Defendant sent the letter to their business attorney and had planned to respond. [53] at 189−90. Deehan testified that Defendant did not stop using the name "Impact Solutions" after receiving the cease-and-desist letter, not because they were trying to cause confusion or trade off Plaintiff's goodwill, but because the company's name was "Impact Solutions." *Id.* at 190.

With regard to the use of Plaintiff's marks, Meyer testified that Plaintiff continues to use "Impact Networking" with its logo and also uses the word "Impact" in its logo without "Networking." *Id.* at 18. He also testified that his company still uses "Impact Networking" as well as just "Impact" on letterhead, invoices, and proposals. *Id.* at 47. Deehan testified that Defendant has used its current logo since October 2014; prior to that date, Defendant used a similar logo that included the words "Impact Technology Solutions." *Id.* at 88-89. As of October 2014, however, the company dropped "Technology" from the logo because of an allegation of trademark infringement from a different company. *Id.* at 89. Deehan testified that Defendant has used the same logo in every marketing and advertising method it uses, including on its website, its print materials, and its social media accounts

(Facebook, Twitter, LinkedIn). *Id.* at 92–93. The company also includes its logo on shirts, mugs, mousepads, and pens. *Id.* at 93. Deehan testified that Defendant does not formally use "Impact" alone in its logo or promotional materials, though he conceded that Defendant's customers and employees may sometimes refer to the company as "Impact" when discussing the company in shorthand. [53] at 170, 177−180, 183−84, 202.

In addition to Meyer and Deehan, the Court heard testimony from Eric Claussen, a sales representative with Plaintiff. The Court also heard the deposition testimony of Nancy Adomitis, one of Defendant's customers. Counsel for both sides presented oral arguments and submitted written proposed findings of fact and conclusions of law, as well as post-hearing briefs detailing their respective arguments on the propriety of injunctive relief.

II.     Discussion & Analysis

A preliminary injunction is "an extraordinary remedy" involving the "exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008). A party seeking a preliminary injunction "must establish that [it] is likely to succeed on the merits," *Adkins v. Nestle Purina PetCare Co.,* 779 F.3d 481 (7th Cir. 2015), that it has "no adequate remedy at law," and that it will "suffer irreparable harm if a preliminary injunction is denied." *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012); *see*

*also Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014). If the moving party meets these threshold requirements, this Court then "must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Stuller*, 695 F.3d at 678. The Court must also consider the public interest in granting or denying the injunction. *Id.* The Court uses a "sliding scale approach" when weighing these considerations, *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). That is, "the more likely the plaintiff's chance of success on the merits, the less the balance of harms need weigh in its favor" and vice-versa. *Lettuce Entertain You Enterprises, Inc. v. Leila Sophia AR, LLC*, 703 F. Supp. 2d 777, 783 (N.D. Ill. 2010) (citing *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002)). The "sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001) (internal quotation marks omitted).

A. <u>Likelihood of Success on the Merits</u>

A plaintiff can obtain relief under the Lanham Act for infringement of a mark, whether or not it is registered. *E.g., Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767–68 (1992) (Section 43(a) "prohibits a broader range of practices than does § 32," which applies to registered marks). And here, Plaintiff is seeking to enjoin Defendant's use of its logo based upon Plaintiff's registered marks (impact

networking) and its unregistered mark. In either case, to prevail, Plaintiff must establish that: (1) its mark is protectable; and (2) Defendant's use of the mark is likely to cause confusion among consumers. *Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*, No. 14 C 7424, 2015 WL 3633987, at *3 (N.D. Ill. June 10, 2015) (citing *CAE*, 267 F.3d at 673-74); *Slep-Tone Entm't Corp. v. Coyne*, 41 F. Supp. 3d 707, 714–15 (N.D. Ill. 2014) (citing *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001)).

### 1. The Scope of Plaintiff's Protectable Interest

With regard to the registered marks, it is possible that Plaintiff seeks to enforce its marks in a domain that differs from those listed in the registrations. Plaintiff's president, Dan Meyer, testified that Plaintiff has offered managed IT since its inception. [51] at 53. But Plaintiff's trademark registrations, which do not mention computers, undermine that assertion. *See* Plaintiff's Exhibits 2, 3. Indeed, on cross examination, Meyer conceded that Plaintiff's trademark registrations do not even mention IT, managed IT, or information technology at all; and the registration for the second registered mark was written to cover maintenance and repair of office machinery. [51] at 47–49.

Plaintiff argues that it does not matter that it failed to mention managed IT services in its registration because registered marks "cover any services that might be sold by a single provider in the minds of consumers." Plaintiff's Post-hearing Br. [56], at 3. To support its argument, Plaintiff misplaces reliance upon *AutoZone, Inc. v. Strick*, 543 F.3d 923, 931 (7th Cir. 2008). In that case, the Seventh Circuit,

considering likelihood of confusion in the context of a summary judgment motion, noted that the inquiry concerning the "similarity of the products" factor required consideration of whether the parties' products "are the kind the public might very well attribute to a single source (the plaintiff)."' *Id.* at 931 (citations omitted). The court noted that the "rights of an owner of a registered trademark extend to any goods or services that, in the minds of consumers, might be put out by a single producer. Thus, [a] likelihood of confusion may exist even if the parties are not in direct competition, or their products and services are not identical." *Id.* (citing *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 679 (7th Cir. 2001) (internal citation omitted). In *AutoZone*, the plaintiff operated stores that sold automotive products and provided a few related services in conjunction with the sale of those products; the defendant operated two stores that provided automotive services such as car washes and oil changes. 543 F.3d at 926−927. Looking at the parties' respective products, the court held that although no consumer "would mistake an AutoZone store, which mainly sells products, for a WashZone or an OilZone, which primarily provides services," in light of the similarity of the marks, a reasonable consumer "may very well be led to believe that OilZone and WashZone are AutoZone spinoffs." *Id.* at 931. Plaintiff's reliance on *AutoZone* assumes that the provision of managed IT services is related to the maintenance and repair of office machinery in the same way that the provision of car wash services is related to the sale of car wash supplies. The point is not self-evident, and Plaintiff makes no attempt to support it. Plaintiff's registrations never even mention computers or servers.

Also problematic is the fact that Plaintiff seeks relief based upon its registered marks when the record fails to clearly show that it still uses those marks. It is undisputed that Plaintiff never registered a mark using "Impact" by itself. *Id.* at 49. The record remains less clear as to whether Plaintiff has abandoned the marks it did register. When asked at his deposition about the use of Impact with Networking, Meyer testified that the company had pretty much dropped "Networking" within the past five years:

> Q. Are you aware of any use by Impact Networking in advertising of the phrase Impact Networking within the last five years?
> A. No. It's pretty much Impact. I think other than if you went on our website there – there might be some phrasing like when you look at a company's profile or what we do, that type of thing. But the logo itself – ironically, we were walking down the street, and an Impact managed IT truck pulled by but it just says Impact.
> Q. So is it correct to say that for at least the past five years the branding done by Impact Networking in advertisements has been the word Impact by itself and not the phrase Impact Networking?
> A. Yes. That's fair.

Defendant's Exhibit 40 at 48, lines 7–23. At the evidentiary hearing on the preliminary injunction motion, Meyer seemed to walk back his prior sworn statements, testifying that Plaintiff continues to use its registered marks. In either event, it is undisputed that Defendant's logo does not use "impact" by itself, but only with "solutions." [53] at 157, 167–68, 170, 178–81.

Questions concerning the scope of Plaintiff's protectable interest and any abandonment of the registered marks will no doubt come up again as this case proceeds. For present purposes, however, the record indicates that Plaintiff appears to possess a protectable interest in its marks that remains enforceable in the area of

managed IT services.  As such, this Court proceeds to the question of customer confusion.

### 2.    Likelihood of Confusion Factors

Likelihood of confusion "is a question of fact," analyzed by considering seven factors: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) whether actual confusion exists; and (7) whether the defendant intended to 'palm off' his product as that of the plaintiff." *CAE*, 267 F.3d at 677–78 (citing *Ty, Inc.*, 237 F.3d at 897–98).  The "likelihood of confusion test" remains an "equitable balancing" test; no single factor is dispositive, but three are "likely to be particularly important: the similarity of the marks, the defendant's intent, and actual confusion." *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000).  That said, "there is no hard and fast requirement that all three of these factors must weigh in the plaintiff's favor in order to find that a likelihood of confusion exists," because "the district court must give appropriate weight to the factors that are particularly important based on the facts of each case." *CAE*, 267 F.3d at 686–87.

Turning first to the similarity of the marks, a side-by-side comparison of Defendant's logo and Plaintiff's marks reveals obvious differences.  Plaintiff registered two marks, both of which use the word "impact" with the word "networking." *See* Plaintiff's Exhibits 2, 3.  The first mark registered just "impact

networking"; the second, Reg. No. 2,428,340, adds the cube symbol immediately preceding the word "impact." *See* Plaintiff's Exhibit 3. Defendant's logo is similar to Plaintiff's registered marks in that they both use two words, with "impact" emphasized over the other word. And it remains similar to one of the registered marks, and the unregistered mark, in that it also uses a symbol preceding the word "impact." Yet, the words are different (Plaintiff uses "impact" either by itself or with "networking" and Defendant uses "impact" in all cases with "solutions"); the symbols are also distinct (Plaintiff uses a cube with the dot from the "I" in impact cut out; Defendant uses a circle with an "I" in it); and the visuals are different (in the unregistered mark, Plaintiff spells "impact" using lower case lettering and uses a red symbol with white letters; Defendant spells "impact" using upper case letters of a different font, and uses a blue and black symbol with black letters to spell impact and red letters to spell solutions). To the extent this factor might weigh in Plaintiff's favor at all, it does so just barely.

Turning to Defendant's intent, Plaintiff offers no evidence to show that Defendant intended to piggyback on Plaintiff's considerable success. The sole piece of evidence offered on this score is the fact that Defendant ignored Plaintiff's cease-and-desist letter. Initially, the evidence shows that Defendant did not ignore the letter: Deehan testified that Defendant forwarded the letter to its attorney and had planned to respond until Plaintiff filed suit. It is true that Defendant did not stop using its logo after receiving the letter. But, contrary to Plaintiff's argument, that course of conduct does not necessarily indicate an intention to profit from Plaintiff's

success.  In fact, Deehan testified that Defendant did not use its logo to trade on Plaintiff's success.  Defendant's conduct might also make sense if it believed (as it says it did) that Plaintiff's infringement claim was baseless.

This Court similarly finds that Plaintiff has failed to prove actual confusion. "Likelihood of confusion" in the context of trademark law has several components:

> First, the question is not whether anyone who might view the marks would be confused; rather, the relevant class consists of consumers who might purchase either the plaintiff's or the defendant's products or services.  Second, as to the type of confusion, the relevant question is whether a prospective customer is likely to believe that the plaintiff is the source of or is otherwise affiliated with the defendant's marked products or services.  Third, as to the risk of confusion, "[p]ossible confusion is not enough; rather, confusion must be probable."

*Epic Sys. Corp. v. YourCareUniverse, Inc.*, 244 F. Supp. 3d 878, 889–90 (W.D. Wis. 2017).  *See also AutoZone*, 543 F.3d at 931 (the relevant consideration is not whether "the public would confuse the *marks*," but rather whether the relevant customer "would believe that the trademark owner sponsored, endorsed or was otherwise affiliated with the product") (emphasis in original).

Here, the evidence shows that the parties' customers are not likely to be confused about the companies: Meyer and Deehan both testified that, when courting prospective customers, both companies target owners and C-level employees, and the process of taking a customer from prospect to signed client takes several months and meetings.  Such customer contacts are savvy enough that they would not be confused, and the solicitation process further establishes that confusion is not likely among consumers who might purchase the parties' managed IT services.

In an attempt to show confusion, Plaintiff relies upon two incidents. First, Plaintiff relies on the 2016 emails from Joshua Loudenslager of Synnex. Loudenslager sent an email on January 20, 2016 that, although intended for Plaintiff, mistakenly copied one of Defendant's employees. *See* Plaintiff's Exhibit 10. And he sent a second email on April 7, 2016 that, although intended for Defendant, was mistakenly sent to one of Plaintiff's employees. *See* Plaintiff's Exhibit 9. The latter exhibit shows that, the same day, Plaintiff's employee responded saying "what PO is this for" I noticed "Impact Technology Solutions" below – that isn't us." *Id.* The vendor responded "You know what . . . you are right. I'm sorry Haley . . . ." *Id.* According to Meyer, apparently both companies had business with this vendor and the vendor "accidentally sent that email to the defendant." [51] at 42. There is no evidence to suggest that the vendor actually confused the two businesses. In fact, the record includes a declaration from Loudenslager in which he represents that he did not actually confuse the businesses, that he knew they were separate and unrelated, and that he simply made a mistake when he sent the emails to the wrong email address. *See* Defendant's Exhibit 24.

Next, Plaintiff offers an incident that occurred in April 2017. According to Meyer, a sales rep cold called a business and "the customer confused us with Impact Solutions, who was the current vendor of that particular client." [51] at 42. Plaintiff provided the testimony of Eric Claussen, an account manager for Plaintiff, who testified that, on April 25, 2017, he made a cold call on ServPro of Western

Lake County in Griffith, Indiana. At that time, the manager told Claussen that her company already used "Impact"; it turned out the company actually used Defendant, and not Plaintiff. *Id.* at 73−75. Initially, it does not appear that the client was confused about which entity was providing services; rather, it appears that the client knew all along that Defendant provided its IT services, but that Claussen may have been less than clear when he announced his employer. Claussen testified that, at the time of the cold call, he was aware of Impact Solutions. *Id.* at 75. Yet he testified on cross-examination that he could not recall if he had initially identified himself as being from "Impact Networking" or just "Impact." *Id.* at 76. And Defendant provided evidence from the client, who testified that she was not confused and knew exactly who was providing the company's IT services; that she never thought one company was affiliated with the other; and that she was very happy with the services provided by Defendant. *See* Plaintiff's Exhibit 24 (Deposition of Nancy Adomitis).

The other factors on likelihood of confusion remained balanced, with the similarity of the products favoring Plaintiff (the services offered by the two companies are identical) and the degree of care favoring Defendant (both companies employ a rigorous solicitation process, whereby clients are courted via multiple C-level meetings over a significant period of time and contractual relationships also span a significant period). The area and manner of concurrent use factor favors Plaintiff, as both parties operate in Northwest Indiana (though they both also operate in separate geographic areas). But the strength of the mark factor favors

Defendant; Plaintiff's mark, though certainly visible (with Plaintiff's significant investment in arena advertising), lacks the distinctiveness that would allow consumers "to identify the products or services sold as emanating from a particular source." *CAE,* 267 F.3d at 684. Indeed, a quick Internet search shows that these two companies are hardly unique in their use of the word impact, even combined with a symbol, further undermining Plaintiff's claim that its mark is strong. *See One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1164–65 (9th Cir. 2009) (wide use of similar terms by different companies further weakens the mark); *Packman*, 267 F.3d at 646 ("widely used descriptive phrase" indicated a weak mark).

For these reasons, the Court finds that Plaintiff fails to demonstrate a likelihood of success on the merits of its trademark infringement claims. Based on the record, this finding applies with equal force to Plaintiff's deceptive trade practices and common law unfair competition claims. *See MetroPCS v. Devor*, 215 F. Supp. 3d 626, 633 (N.D. Ill. 2016) (citing *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1219 (7th Cir. 1997)).

### B.  Irreparable Harm to Plaintiff

Generally, in this Circuit, irreparable harm is presumed in a trademark infringement suit. *Redbox Automated Retail, LLC v. Xpress Retail LLC*, No. 17 C 5596, 2018 WL 1240345, at *2 (N.D. Ill. Mar. 9, 2018). The presumption may be rebutted, however, if the plaintiff unreasonably delayed in seeking preliminary injunctive relief. *Id.* (citing *Ty, Inc.*, 237 F.3d at 903 ("[d]elay in pursuing a

preliminary injunction may raise questions regarding the plaintiff's claim that [it] will face irreparable harm if a preliminary injunction is not entered"); *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 441–42 (E.D.N.Y. 2013) (five-month delay "destroy[ed] a presumption of irreparable harm" in a false advertising case)).

Here, the record shows that Plaintiff may have known about Defendant's existence and operation as early as January 2016, when Joshua Loudenslager of Synnex sent an email to Hannah Dobryman, Plaintiff's manager for leasing and accounts receivable, and Jeremy Carhahan, at Defendant, following up on a potential business opportunity. *See* Plaintiff's Exhibit 10. Plaintiff's president and founding partner conceded that Dobryman reported directly to Plaintiff's CEO and CFO, and he conceded that Plaintiff took no action against Plaintiff at this time, *id.* at 60, though he testified that "the people who would have sued didn't know anything about it," *id.* at 61. He admitted that "the people who would have sued" included himself and the CEO, to whom Hannah Dobryman reported. *Id.* at 61. Loudenslager sent a second email on April 7, 2016, attaching a purchase order intended for Defendant. *See* Plaintiff's Exhibit 9. This evidence, combined with Meyer's testimony concerning the importance of monitoring corporate trademarks for third-party use, *see* [51] at 61−62, suggests that Plaintiff knew or should have known of Defendant's existence by April 2016. If that is true, Plaintiff, having waited more than a year to sue in this Court, is not entitled to a presumption of irreparable harm. Without that presumption, Plaintiff cannot show that it will suffer irreparable harm absent injunctive relief.

Plaintiff and Defendant have both been using their respective logos in the same domain, in the same basic geographical region for more than six years. Meyer, Plaintiff's president, conceded that Plaintiff has no evidence of any lost customers or lost sales due to Defendant's use of "Impact" in its name. [51] at 59. Nor has Plaintiff ever received any complaint intended for Defendant. *Id.* at 60. Nor has Plaintiff increased its advertising expenditures because of Defendant's use of the "impact" logo. *Id.* at 60. In fact, Meyer testified that in 2011 Plaintiff's revenues from managed IT totaled approximately $400,000, in 2016 they totaled $1.9 million, and in 2017 the company was "on pace to do approximately 4 million" in managed IT. *Id.* at 16, 59. Additionally, Meyer testified that revenues from managed IT services accounted for less than 4% of Plaintiff's total revenues, and Plaintiff's total company revenues were north of $58 million in 2016. *Id.* at 59. In short, without the benefit of a presumption of harm, Plaintiff would lose on this issue as well, as it has not shown *any* harm from Defendant's use of the impact logo.

C.  Adequacy of Available Remedy at Law

To the extent Plaintiff could show harm, it fails to show that money damages would not adequately compensate it. Plaintiff offers no evidence of lost customers (on the contrary, the evidence shows that its business is booming), no evidence that its goodwill has been or may be eroded, and no evidence that its reputation may be harmed by Defendant's use of an impact logo.

D.     Balance of Harms & Public Interest

Although not necessary in light of the Court's findings above, the Court considers the balance of harms.  In assessing the potential harm to the respective parties, the Court applies a "sliding scale"—that is, the more likely Plaintiff is to win, the less heavily the balance of harms needs to weigh in its favor; the less likely Plaintiff is to win, the more the balance needs to weigh in its favor.  *Girl Scouts*, 549 F.3d at 1086.  Even if a plaintiff's suit appears to have merit, an injunction "should not necessarily issue if the harm to the defendant would substantially outweigh the benefit to the plaintiff."  *Michigan v. U.S. Corps of Army Engineers*, 667 F.3d 765, 789 (7th Cir. 2011).

Here, the evidence shows that the parties have co-existed in Northwest Indiana for more than six years.  During that time, Plaintiff's business has continued to grow substantially.  This Court is not persuaded that Defendant's existence and operation has limited Plaintiff's growth or otherwise harmed Plaintiff.  On the other hand, the evidence suggests that granting Plaintiff the relief it seeks could drive Defendant out of business.  Because the balance of harms favors Defendant, the Court can discern no public interest to be served by granting the injunction Plaintiff seeks.

## Conclusion

Injunctive relief is an extraordinary remedy in any case.  Here—where Plaintiff's claims presume a significant expansion of what Plaintiff actually registered (both in terms of the marks described and in terms of the services

identified)—granting such relief certainly requires an extraordinary showing. As explained above, Plaintiff fails to make such showing. Accordingly, applying the appropriate standards, this Court denies Plaintiff's preliminary injunction motion [17].

Dated: March 26, 2018

ENTERED:

John Robert Blakey
United States District Judge